UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------x

H.H.,

                                Plaintiff,

        - against -

THE CITY OF NEW YORK and WAYNE
S. TAYLOR,

                                Defendants.

------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ AUG 0 7 2017 ★

BROOKLYN OFFICE

**OPINION AND ORDER**
**11-cv-4905 (NG) (ST)**

GERSHON, United States District Judge:

Plaintiff, H.H., brings this action against defendants Wayne S. Taylor and the City of New York, asserting claims pursuant to 42 U.S.C. § 1983 and New York State tort law.[1] Plaintiff alleges that Taylor, a former police officer in the New York City Police Department ("NYPD" or "Department"), used his power as an officer to intimidate and coerce her into performing sex acts as a prostitute at age thirteen. Against the City, which does not dispute Taylor's misconduct, she asserts a § 1983 claim under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), for failure to supervise and discipline Taylor and a state law claim for negligent supervision and retention of Taylor. Taylor, who is not represented by the City's counsel, has never responded to this action and has pled guilty to charges relating to his conduct with H.H.

It is undisputed that Taylor kidnapped H.H. and forced her into prostitution. The only remaining question is whether the City may be held liable for the harm H.H. suffered. The City now moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on all claims against it. For the reasons set forth below, the City's motion is denied.

---

[1] Plaintiff has withdrawn her claims against the City for assault, battery, false imprisonment, prima facie tort, and outrageous conduct.

## FACTS

Unless otherwise noted, the following facts are undisputed.

For roughly two weeks, from January 10 to 24, 2008, Wayne S. Taylor and his girlfriend, Zalika Brown, forced H.H., who was thirteen years old at the time, into prostitution. On January 24, 2008, Taylor "sold" H.H. to another pimp, who, in turn, gave her to his nephew, who released her on January 27, 2008. She was raped and beaten repeatedly during this time.

While in his custody, Taylor forced H.H. to perform sexual acts in exchange for money with multiple men. Taylor, who knew she was only thirteen years old, told H.H. that he was a police officer, and he threatened that he would put her on the street and arrest her for prostitution if she refused to do as he said. Taylor also beat her and had Brown and others beat and sexually assault her when she resisted. Taylor also told H.H. that, as an officer, he could protect her from the police. H.H. testified that she did as she was told because she was scared of Taylor.

Taylor was an NYPD officer for over thirteen years. He served first as an officer and then as a detective in the Narcotics Division of the NYPD for about nine years and three months, from October 6, 1997 to January 18, 2007. The Narcotics Division is part of the Organized Crime Control Bureau ("OCCB").

At the time he kidnapped and prostituted H.H., Taylor was on modified duty because he had been discovered using a Department vehicle for personal purposes. During at least part of his tenure in the Narcotics Division, Taylor served undercover. There is a disputed issue of fact, not material to the resolution of this motion, as to how much of Taylor's service in the NYPD was undercover.

During his time in the Narcotics Division, Taylor was the subject of 25 complaints. Taylor was exonerated of three of the allegations: an allegation that he took property while executing a

warrant and two allegations that he took or misplaced a prisoner's property. Most of the rest of the allegations were unsubstantiated or the findings remained pending. A finding that an allegation is "unsubstantiated" means that the investigating officer was unable to determine, based on the evidence gathered, whether the allegation was true or false.

Those complaints most pertinent to this case are discussed below. They fall into three general categories: misuse of police authority, relations with prostitutes, and criminal activity.

In December 2002, just over five years after Taylor joined the Narcotics Division, the NYPD Internal Affairs Bureau ("IAB") received two successive complaints about Taylor within days of each other, the first alleging that he was involved in a dispute at a hotel and the second that he was associating with a known prostitute. The first complaint was marked by IAB as a misconduct case; the second complaint was marked as a corruption case. The decision of whether to assign an investigation of an officer to IAB or the officer's command is made by the Assessment Unit, a unit within IAB. OCCB was frequently assigned to investigate its officers' misconduct cases, but cases labeled "corruption" and other serious allegations typically went to IAB, which had more resources. Deputy Inspector Derrick Corrado of IAB characterized the allegation that Taylor associated with a known prostitute as a serious transgression. Nevertheless, the allegation was not investigated by IAB but by Sergeant Mitchell Aftel of OCCB.

Sergeant Aftel learned from the responding officer that Taylor was at a hotel room with a woman, Hillary Moore, who had had multiple prior arrests for prostitution and had an active bench warrant. Another man, Jermaine Fraser, arrived at the hotel and tried to gain entry to the hotel room, saying that Moore was his girlfriend. Police responded to complaints at the hotel, and the incident ended with Moore and Fraser leaving the hotel together. Sergeant Aftel and two other officers—the responding officer, Sergeant Michael Mollaghan, and an initial investigator, Captain

Christopher Monahan—interviewed Fraser, Moore, and Taylor. Sergeant Aftel had access to all these interviews as part of his investigation. Fraser reported to the officers that, when he was outside the hotel room, he heard Moore, from inside the hotel room, tell Taylor to get off her and let her go. Fraser also reported that Taylor threatened to shoot him. Both Fraser and Moore independently told the officers that Taylor had stalked and harassed Moore and that Taylor had previously threatened to shoot and arrest Fraser.

Sergeant Mollaghan recognized Moore and Fraser from an incident a month earlier. While on patrol, Sergeant Mollaghan had observed Fraser, driving an SUV and attempting to force over a smaller car, which Moore was driving. When Sergeant Mollaghan stopped the two, Fraser came out of the car shouting that Moore was his girlfriend and that she was dating a police officer. Moore confirmed that the person she was dating may have been a police officer. Neither Moore nor Fraser wanted to file a complaint.

Sergeant Aftel later interviewed Moore, who told him that she had told Taylor that she had numerous arrests for prostitution. Moore also told Sergeant Aftel that she spoke to a prostitute nicknamed China, who told Moore that she, China, was in a sexual relationship with Taylor. Moore further reported to Sergeant Aftel that she believed that Taylor "like[s] to pick up prostitutes." Sergeant Aftel also interviewed Taylor, who told Sergeant Aftel that he had not been aware that Moore was a prostitute. Taylor told Sergeant Aftel that he gave Moore money for her child, for moving expenses, and for an abortion, but never paid her for sex. To verify Taylor's account that he did not know that Moore had arrests for prostitution, Sergeant Aftel checked to see if Taylor had run Moore's name in the warrant system, which would have revealed to Taylor that Moore had an active bench warrant, but Taylor had not done so, at least under his name.

Sergeant Aftel also went to Moore's address on three occasions to see if Taylor was stalking or harassing her, but did not find him there. To investigate Moore's allegation that Taylor associated with other prostitutes, Sergeant Aftel interviewed China, and showed her a photo array which included Taylor. Sergeant Aftel asked her if she had ever exchanged money for sex with any of the men in the pictures. She responded that she had not.

At some point during his investigation, Sergeant Aftel told his commanding officer, Captain Dennis Gallagher, that the case should be transferred to IAB. It was unusual for Sergeant Aftel, who was investigating the complaints against Taylor alone, while also investigating 15-20 other cases, to handle corruption cases. He believed that he lacked the resources, time, and staff to adequately investigate the allegations against Taylor. According to Sergeant Aftel, adequately investigating just the allegation against Taylor that he associated with a known prostitute would require following Taylor to see if he was associating with other prostitutes, speaking to informants and officers from relevant units in the NYPD, and checking Taylor's phone records. Despite Sergeant Aftel's request that the investigation be transferred and Deputy Inspector Corrado's characterization of the allegations as serious, the case was never transferred to IAB. When asked in 2015 about his denial of Sergeant Aftel's request, Captain Gallagher stated that he had no recollection of the case or of Taylor.

Captain Monahan, who conducted the initial investigation, determined that it was possible that Taylor was stalking and harassing Moore, and that further investigation, including "phone work," was needed. Taylor's phone records were never checked. Based on Captain Monahan's initial findings, Taylor was placed on modified duty, but Department officials later closed the investigation, finding the allegations against Taylor to be unsubstantiated.

5

Moore filed another complaint in April 2003, alleging that Taylor came to her mother's house. When interviewed by Sergeant Aftel, Taylor said he was in a motel in Baltimore, Maryland, and presented a receipt for the motel. Sergeant Aftel determined that Moore complained falsely. But Sergeant Aftel did not investigate what time Taylor checked into the motel and did not note what time Moore alleged that Taylor went to her mother's house. Sergeant Aftel testified that, had he had more resources, he would have further investigated the allegation by probing what time Taylor checked into the motel to rule out whether Taylor could have been at both places that day.

In November 2006, Taylor was involved in another dispute while off-duty at the house of his girlfriend, Zalika Brown. (Brown would later be Taylor's accomplice in kidnapping and prostituting H.H.). Following a dispute at Brown's house, Taylor arrested two men, who were relatives of Brown's roommate. Taylor told investigators that Brown and her roommate got into a verbal dispute and that, when Taylor and Brown tried to leave, the two men brandished knives at him. Brown's roommate and another male relative of hers who was at the house told investigators that Brown's roommate and Brown were shoving each other, when Taylor responded by pulling out his gun and yelling that he was "going to shoot" and "I'm going to blow someone's fucking brains out." Brown's roommate's mother reported that she arrived at the house when Taylor was brandishing his gun "erratically." All three stated that no one had displayed any knives.

Investigators also learned that Taylor met Brown when she was a prisoner in the Narcotics Division prisoner van that he was assigned to drive. Brown's roommate and her mother told investigators that Taylor was physically violent towards Brown and even pointed his gun at her. They further reported that Taylor brought Brown packages of marijuana that he obtained from people he arrested and that he would ask Brown if she knows people he could arrest. However, an officer who interviewed Brown's roommate later wrote in his report that she recanted the

allegations that Taylor was "distributing narcotics[] [and] associating with criminals." The investigation was closed in April 2007. The allegations stemming from this incident were found to be "partially substantiated," but it is not clear which of the allegations was substantiated. Taylor's record does not reflect that he was disciplined for any of these allegations.

In September 2007, Hillary Moore contacted investigators to inform them that she had observed Taylor use and buy cocaine. Investigators did not follow up on these allegations.[2] In November 2007, a complainant called the police to report that Zalika Brown called and threatened her repeatedly, saying that she and her boyfriend, who was a police officer, would "get you" and that her boyfriend would "set you up." The complainant reported that Brown's boyfriend was named "Wayne" and that she knew he was an officer because she had seen his uniform at Brown's home. The allegation was logged in Taylor's personnel record. Again, there is no indication that investigators followed up on these allegations before H.H.'s complaint. When, later, in 2011, he reviewed the investigation into Taylor, Deputy Inspector Corrado wrote that "IAB Intel was never done on Det. Taylor as recommended."

In contrast, when Taylor was suspected in December 2006 by his superiors of using a Department vehicle for personal purposes, investigators performed a thorough investigation that substantiated his superiors' suspicions. After noticing that a vehicle that Taylor had been using was unaccounted for, Taylor's supervisors at Narcotics Borough Queens, where he was serving at the time, initiated an internal investigation into his use of the vehicle. Over the course of ten days, investigators surveilled Taylor, following him and observing his use of a Department vehicle while off-duty. Based on their investigation, Taylor's supervisors determined that he violated NYPD

---

[2] When Taylor was later arrested and his precinct locker was searched, officers found a crack pipe and zip lock bags containing cocaine residue.

rules and suspended him for thirty days. When he returned, he was placed on modified duty until he was terminated for his offenses against H.H. in 2008. Taylor had also been disciplined earlier in his career as an officer for losing a Department transmitter, forfeiting one vacation day as a result.

In a 2015 affidavit, Taylor stated that, as an undercover officer, he was trained to fit in with prostitutes, pimps, and drug dealers and "function in the persona of a criminal." Though he was occasionally investigated by the Department, "little or nothing came of [the] investigations." As a result, he felt "empowered to believe I could get away with unlawful activities." Sergeant Aftel testified that the news of Taylor's crimes "didn't surprise" him "[b]ecause of the nature of the original allegations."

## Expert Opinion and Reports

In addition to the facts set forth above, plaintiff relies on an expert, Joseph A. Pollini, and a 1998 report by the U.S. General Accounting Office ("GAO Report") which detailed issues of police corruption in several cities across the country, including New York City. The GAO Report in turn relied on a report by the Mollen Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department, established in 1992, to study corruption in the NYPD. With respect to plaintiff's proffered expert, Mr. Pollini served as a member of the NYPD for over 33 years in a variety of roles and has been teaching in the Department of Law, Police Science, and Criminal Justice Administration at John Jay College for 22 years. The City has not challenged Mr. Pollini's qualifications as an expert.[3]

---

[3] The City points out that Mr. Pollini's tenure at the Narcotics Division was in the 1970's, well before the events here. However, Mr. Pollini is also a longtime teacher of police practices and criminal justice.

Mr. Pollini states that it is the policy of the NYPD not to allow an officer to remain in the Narcotics Division for longer than five years because of the potential for corruption among police officers who investigate drug-related crimes. The heightened potential for corruption among narcotics officers is well-documented and well-known to the NYPD and was detailed in the Mollen Commission Report and the GAO Report. Enforcement of laws against vice generally, such as gambling, prostitution, and drugs, affords more opportunities for police corruption. The Mollen Commission found that, unlike other types of corrupt police officers, who may ignore or protect criminals, corrupt narcotics officers are more likely to actively commit crimes themselves.

According to Mr. Pollini, undercover narcotics detectives present a special risk of corruption. Undercover detectives are trained to mix in with prostitutes, drug dealers, and pimps, and are even trained in how to commit crimes and avoid detection. As noted above, Taylor confirms this, stating that he was trained to fit in among drug dealers, prostitutes, and pimps. Mr. Pollini also opines that, because of the potential for corruption among undercover narcotics detectives, proper police practices and procedures require commanding officers of such detectives to be aware of what the detectives are doing and with whom they are communicating.

In addition, Mr. Pollini opines that "the allegations against Taylor regarding sexual offenses and drug use, notwithstanding that some were never substantiated, put the NYPD on notice of the reasonable likelihood that Taylor was using his police training to engage in illicit behavior." In Mr. Pollini's expert opinion, to stop such an officer, the "police department should subject [him] to regular questioning, supervise him closely while on duty, subject him to integrity and drug testing, and have him occasionally surveilled without his knowledge while off duty." According to Mr. Pollini, Department officials did not allocate sufficient resources to the investigation of Taylor, which "was a departure from acceptable and proper police procedure and

reflects a lack of commitment to the investigation of Taylor." Finally, according to Mr. Pollini, the allegations surrounding Taylor's encounters with Jermaine Fraser and Hillary Moore, as well as the allegations that he was involved with at least one other prostitute, China, should have alerted trained police officers like Taylor's supervisors to the possibility that his repeated disputes with Fraser were, in fact, disputes between two pimps for control of a prostitute.

## DISCUSSION

### I.    Summary Judgment Standard

A party is entitled to summary judgment only if there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are "facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the non-moving party must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Ind. Co., LTD. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted). The court must construe the facts in the light most favorable to the non-moving party and "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 216 (2d Cir. 2001); *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 600–01.

10

## II. Plaintiff's § 1983 Claim for Failure to Supervise and Discipline Taylor

Section 1983 provides a civil claim for damages against "anyone who, under color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution" or statutes of the United States. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (internal quotation marks omitted); *see also Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). To prevail on a § 1983 claim against a municipality based on acts of a public official, a plaintiff must prove: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).

Here, the City argues that plaintiff cannot establish that Taylor acted under color of law, that the City caused her injury, or that her injury occurred pursuant to an official municipal policy—elements one, three, and five. It does not dispute elements two and four—that plaintiff suffered a deprivation of a constitutional right and that she suffered damages.

### A. Color of State Law

"It is firmly established that a defendant in a § 1983 suit acts under color of law when he abuses the position given to him by the State." *West v. Atkins*, 487 U.S. 42, 49–50 (1988). And, while "acts of officers in the ambit of their personal pursuits are plainly excluded...[,] an official may act under color of law even when he or she encounters the victim outside the conduct of official business and acts for reasons unconnected to his or her office, so long as he or she employs the authority of the state in the commission of the crime." *United States v. Giordano*, 442 F.3d 30, 42–43 (2d Cir. 2006).[4]

---

[4] While the Second Circuit in *Giordano* was applying the "under color of law" requirement of 18 U.S.C. § 242, it noted that the "requirement of § 242 is identical to the requirement under 42 U.S.C. § 1983 that an official act under color of law." 442 F.3d at 42 n.16.

"[T]here is no bright line test for distinguishing personal pursuits from actions taken under color of law." *Id.* (quoting *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994). However, courts have found that threatening arrest or identifying oneself as an officer may be sufficient to satisfy the "under color of law" requirement. *See Lizardo v. Denny's, Inc.*, 2000 WL 976808, at \*10 (N.D.N.Y. July 13, 2000); *cf. Claudio v. Sawyer*, 675 F. Supp. 2d 403, 409–10 (S.D.N.Y. 2009) (holding that officer did not act under color of law where, "[u]nlike in *Lizardo*," there was no allegation that the officer threatened or attempted to arrest decedent). Significantly, the Second Circuit has found that "a state official acted under color of state law even when acting outside the ambit of official duty because the official used his or her power to make the crime possible by causing the victim to submit." *Giordano*, 442 F.3d at 44.

Here, plaintiff repeatedly testified that Taylor identified himself as a police officer, which he was, and threatened to arrest her if she resisted. Taylor also indicated that, as an officer, he could protect her from the police. H.H. testified that she did as she was told because she was scared of Taylor. He, thus, successfully used his power as a police officer to make H.H. submit. Forcing plaintiff into prostitution was, of course, not part of his official duties as an officer. But an officer acts under color of law even when he "abuses the position given to him by the State." *West*, 487 U.S. at 49–50.

The City argues that Taylor did not act under color of law because anyone could have done what Taylor did by lying that he was a police officer and threatening to arrest H.H. In essence, the City's argument is that, although Taylor told H.H. he was an officer, he did not prove it. This argument is unconvincing. That a police officer prove that he is in fact a police officer is not a requirement of acting under color of law. As the Supreme Court has held, "[i]f an individual is possessed of state authority and purports to act under that authority, his action is state action. It is

irrelevant that he might have taken the same action had he acted in a purely private capacity." *Griffin v. Maryland,* 378 U.S. 130, 135 (1964). The City also points out that others, who were not officers, threatened and assaulted H.H., too, but that plaintiff makes no claim that they acted under color of law. This, too, is irrelevant since "[s]ection 1983 is meant to proscribe certain actions by state officials even though identical conduct by private persons is not included within the statute's scope." *Polk Cty. v. Dodson,* 454 U.S. 312, 330 n.1 (1981). Accordingly, a reasonable jury could find that Taylor acted under color of law when he identified himself as an officer and threatened to arrest H.H. if she refused to obey him.

### B. Existence of an Official Policy or Custom

Under § 1983, a municipality is responsible only for its "*own* illegal acts." *Connick v. Thompson,* 563 U.S. 51, 60 (2011). It cannot be held vicariously liable for the constitutional violations of its employees. *Id.* Thus, a municipality may be held liable only where an "official municipal policy" causes the constitutional deprivation. *Id.* (quoting *Monell,* 436 U.S. at 690). "Official municipal policy" includes laws passed by legislators, acts of policymaking officials, and "practices so persistent and widespread as to practically have the force of law." *Id.* at 61. Thus, a plaintiff may satisfy the policy or custom requirement in one of four ways:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York,* 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010). Here, plaintiff's theory of municipal liability is that the City displayed deliberate indifference by failing to supervise and discipline Taylor despite being alerted to repeated allegations against him.

13

To prove a failure to supervise and discipline claim, a plaintiff must establish the City's "duty to act by proving [it] should have known [its] inadequate supervision was so likely to result in the alleged deprivations so as constitute deliberate indifference" to the rights of the public, *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007), "such that [the City's] inaction constitutes a 'deliberate choice,' [and] that [its] acquiescence may 'be properly thought of as a city 'policy or custom' that is actionable under § 1983.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (2011)). The Supreme Court has cautioned that deliberate indifference is a stringent standard of fault. *Connick*, 563 U.S. at 61. "The operative inquiry is whether [the] facts demonstrate that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'" *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (quoting *Amnesty Am.*, 361 F.3d at 128). Thus, a plaintiff must prove that "the need for more or better supervision to protect against constitutional violations was obvious,'... but the policymaker 'failed to make meaningful efforts to address the risk of harm to plaintiff[]].'" *Id.* (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995), and *Reynolds*, 506 F.3d at 192, respectively).

A plaintiff can demonstrate an obvious need for better supervision "through proof of repeated complaints" against an officer "followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann*, 72 F.3d at 1049. Thus, in *Vann*, the Second Circuit found that the plaintiff proffered sufficient evidence to prove that the City had been deliberately indifferent because, despite receiving numerous complaints against the particular officer who assaulted the plaintiff, the City failed to take meaningful measures to monitor the officer and deter further incidents. *See* 72 F.3d at 1049–51. In *Cash*, the Circuit found for the plaintiff, a female prisoner who sued the county for deliberate indifference after a prison guard

raped her, relying on more general evidence of sexual contact between prison guards and prisoners in that and other New York prisons. 654 F.3d at 333–38. The Circuit held that a reasonable jury could find that prison officials were on notice of an obvious need to better supervise prison guards because of a previous incident at the prison of prohibited sexual contact between another prisoner and another prison guard, as well as highly publicized incidents at other New York prisons of such sexual contact. *Id.* Finally, in *Disorbo v. Hoy*, the Circuit found that a reasonable jury could conclude that a city's failure to discipline officers involved in brutally beating a man in his apartment signaled to officers in that city's police department that it tolerated misconduct and police brutality. 74 F. App'x 101, 104 (2d Cir. 2003). Thus, the city could be held liable for deliberate indifference where an officer in that department used excessive force against the plaintiff, even though the officer was not involved in the previous beating. *Id.*; *see also Disorbo v. Hoy*, 343 F.3d 172 (2d Cir. 2003) (setting forth the facts of the case in more detail in addressing damages).[5]

Here, plaintiff proffered evidence that City officials learned of a long list of allegations about Taylor's own behavior that a reasonable jury could conclude should have alerted them to the need to better supervise and discipline him. NYPD officials received allegations that Taylor

---

[5] The City argues that plaintiff cannot prove deliberate indifference because she cannot satisfy the second element of the test delineated in *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992)—"that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." In *Walker*, the Circuit addressed the viability of claims that the City failed to train or supervise police officers and assistant district attorneys in satisfying their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). The standard in *Walker* was pertinent to that factual situation, but does not provide the exclusive means to establish deliberate indifference. *See, e.g., Vann*, 72 F.3d 1040; *Cash*, 654 F.3d 324. Indeed, only the dissenting judge in *Cash* relied on the three-part *Walker* test. *See* 654 F.3d at 344 (Jacobs, J., dissenting). Nor was the *Walker* test relied on in *Vann*, even though Judge John M. Walker Jr., who had authored that test just three years before in *Walker*, was on the panel in *Vann*.

had sexual relationships with prostitutes, as well as with a person he met as his prisoner, Zalika Brown—relationships prohibited by NYPD policy. Plaintiff's expert, Mr. Pollini, states that the information known to Department officials should have alerted them to the possibility that Taylor was a pimp and was fighting with another pimp over control of a prostitute. *See Cash*, 654 F.3d at 337 ("[E]ven where [the] need for [a] different policy 'would not be obvious to a stranger to the situation, a particular context might make the need for training or supervision so obvious that a failure to do so would constitute deliberate indifference.'") (quoting *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992)).

Department officials further learned that Taylor allegedly physically abused Brown. Department officials also received allegations that Taylor used his authority as a police officer in personal disputes by brandishing his gun and threatening others with arrest. Moreover, Hillary Moore told investigators that she saw Taylor buy and use cocaine. There were even allegations, though they were recanted, that Taylor took marijuana from people he arrested and gave it to Brown, seemingly, to sell, and that Taylor would ask Brown if she knew people with marijuana he could arrest.

Though many of the allegations against Taylor were never proven, investigators never found them to be false either. Instead, they were found to be "unsubstantiated"—neither proven nor disproven. Unsubstantiated allegations may form the basis of a deliberate indifference claim where there is evidence to suggest that the investigation into the allegations was inadequate. Indeed, the Second Circuit has held that where a "city's efforts to evaluate... claims [are] so superficial as to suggest that its official attitude was one of indifference to the truth of the claim, such an attitude would bespeak an indifference to the rights asserted in those claims." *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986). Thus, in *Fiacco*, the Circuit found that, since

16

the plaintiff proffered evidence that complaints against officers were not adequately investigated, "the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers" were committing violations. *Id.* at 328. And, in *Vann*, the Circuit found that a reasonable jury could conclude that the City's handling of complaints against an officer bespoke indifference even though the complaints were unsubstantiated, because there was evidence that they could nevertheless have been true. *See* 72 F.3d at 1050; *see also Sango v. City of New York*, 1989 WL 86995, at *2–3, 14 (E.D.N.Y. July 25, 1989) (holding that three unsubstantiated and one partially substantiated complaints were sufficient to defeat summary judgment where the plaintiff presented evidence that the investigations were inadequate).[6]

Sergeant Aftel, who investigated most of the allegations into Taylor before the incident with H.H., testified that it was unusual for him to investigate cases designated as corruption cases—such as the allegations that Taylor associated with known prostitutes and that Taylor confronted Moore at her mother's house, as well as a number of other allegations facing Taylor— which tend to require more resources. Sergeant Aftel testified that he believed he did not have adequate staffing and resources to investigate the allegations. In fact, Sergeant Aftel asked his commanding officer to transfer the investigation of Taylor to IAB, which he believed would be in a better position to fully investigate the allegations, but the request was denied. Sergeant Aftel stated that, had he had more time or resources, he would have followed Taylor to determine

---

[6] The City relies on *Marcel v. City of New York*, 1990 WL 47689, at *9 (S.D.N.Y. Apr. 11, 1990) and *Sealey v. Fishkin*, 1998 WL 1021470, at *3 (E.D.N.Y. Dec. 2, 1998) for the proposition that unsubstantiated complaints cannot support a deliberate indifference claim. However, in *Marcel*, there was a single unsubstantiated complaint against the officer and no "evidence that the City's investigation of this matter was deficient." 1990 WL 47689, at *9. And in *Sealey*, there is no recitation of the type or quantity of unsubstantiated complaints against the officer, nor any indication that the investigations into them were inadequate. Under these circumstances, the cases do not advance the City's position.

whether he was associating with prostitutes, checked Taylor's phone records, spoken to informants and other relevant NYPD units, and further investigated Taylor's evidence that he was in Baltimore when Moore alleged that Taylor confronted her at her mother's house.

Further demonstrating shortcomings in the investigation, Captain Monahan's recommendation that Taylor's phone records be checked was not implemented. And in reviewing the investigation into Taylor, Deputy Inspector Corrado discovered that other recommended investigative procedures were never performed.

The investigation into Taylor's misuse of a Department vehicle provides a stark contrast to Taylor's supervisors' efforts to investigate the other allegations against him. Suspecting that Taylor was using a Department vehicle for personal purposes, Taylor's supervisors had him followed off-duty over the course of about a week to discover what he was doing with the vehicle. Sergeant Aftel, on the other hand, simply visited Moore's address on three occasions to see if Taylor was there—an investigation technique which is less resource-intensive and which relies on chance to succeed. It is significant that Taylor, himself, implies in his affidavit that at least some of the allegations were accurate, stating that he felt emboldened by the failure of the investigations to lead to disciplinary actions against him. Accordingly, a reasonable jury could conclude that the Department's investigations into Taylor evinced an "official attitude... of indifference to the truth of the claim[s]." *Fiacco*, 783 F.2d at 328.

While the frequency and nature of the allegations are sufficient on their own to have put the City on notice, plaintiff has also proffered evidence that the City should have paid particular attention to the allegations against Taylor. According to Mr. Pollini and the Mollen Report, Department officials knew or should have known that narcotics officers, especially those trained to operate undercover, present a heightened risk of corruption. In fact, according to Mr. Pollini,

the NYPD has a policy of not placing officers in the narcotics division for longer than five years precisely because narcotics officers are at such a heightened risk of corruption. Despite this policy, Taylor was a narcotics detective for over nine years, and served undercover as well, magnifying the risk that he would become corrupted and, thus, the importance of properly investigating allegations against him.

In sum, a reasonable jury could find from the totality of facts that the City was on notice of an obvious need for better supervision of Taylor and that it was deliberately indifferent to that need.[7]

### C. Causation

In addition to establishing the City's deliberate indifference, the plaintiff must show that the City's failure to supervise and discipline the officer was a proximate cause of the deprivation of her rights. *See Cash*, 654 F.3d at 342; *Ortiz v. Goord*, 276 F. App'x 97, 98 (2d Cir. 2008). Thus, the plaintiff must show that her constitutional deprivations were a reasonably foreseeable consequence of, and substantially caused by, the City's failure to supervise. *See Dodd*, 827 F.2d at 6; *Poventud v. City of New York*, 750 F.3d 121, 159 (2d Cir. 2014); *see also Cash*, 654 F.3d at 331–32, 342. To be reasonably foreseeable, the harm to the plaintiff must be "of the same general nature as that which a reasonably prudent person in the [City's] position should have anticipated" in light of its level of supervision and knowledge of the officer. *Anonymous v. City of Meriden*, 2013 WL 2254181, at *6 (D. Conn. May 22, 2013).

---

[7] The City asserts that Magistrate Judge Levy's decision, on a discovery dispute, binds me, under the law of the case doctrine, to find the City's investigation merely negligent. Judge Levy's ruling was limited to its context and has no bearing on this motion for summary judgment where the court reviews the entirety of the evidence.

The plaintiff has proffered evidence that Taylor's supervisors learned of a number of allegations against Taylor with similarities to his actions toward H.H. First, Taylor faced allegations that, as with H.H., he abused his authority as a police officer. With H.H., Taylor used the threat of arrest to coerce her into prostitution. Before that, Taylor's supervisors received complaints that Taylor likewise abused his authority as an officer by threatening others with arrest and physical violence in personal disputes. Fraser and Moore both told Sergeant Aftel that Taylor threatened to arrest or shoot Fraser. Taylor also allegedly brandished his gun, yelling that he would "blow someone's fucking brains out" in a fight at Zalika Brown's house. In that dispute, Taylor actually arrested two men, saying that they threatened him with knives, but other witnesses alleged that the two men had not displayed knives and that Taylor arrested them as part of a personal dispute.

Taylor also faced allegations that he was involved with prostitutes. First, Taylor's supervisors became aware in 2002 of allegations that Taylor associated with two known prostitutes, Moore and a woman nicknamed China, and that Taylor generally "like[d] to pick up prostitutes." Moreover, Mr. Pollini states that the altercation between Taylor and Fraser at the Riviera Hotel would have alerted a trained law enforcement officer to the possibility that Taylor was in fact a pimp, fighting with Fraser over control of a prostitute. In that dispute, Taylor also allegedly physically held down Moore and threatened to arrest or shoot Fraser when he demanded that Taylor release her. Viewed with Mr. Pollini's expertise, these allegations bear similarities to Taylor's actions toward H.H.

The City argues that Mr. Pollini's opinion is speculative and that there is nothing to support his depiction of the dispute as a fight between two pimps. However, whether Taylor was, in fact, fighting with another pimp over a prostitute is not the issue. If accepted by the jury, Mr. Pollini's

testimony would establish that the City was on notice of the possibility that Taylor was a pimp, which supports the foreseeability of Taylor's crimes against H.H. *Cf. Fiacco*, 783 F.2d at 328. Moreover, more is not known about the dispute at the Riviera Hotel partly because of the Department's inadequate investigation. The City cannot escape liability when put on notice of an officer's possible criminal activities by conducting a poor investigation and then disavowing knowledge as a result of that inadequate investigation.

Finally, Taylor's supervisors learned that Taylor had met Brown while she was his prisoner. Taylor would have had serious coercive power over Brown under the circumstances, as he did over H.H. And as with H.H., Taylor's supervisors received allegations that Taylor was physically abusive toward Brown during their relationship. Department officials also learned that Brown had threatened a woman by saying that her boyfriend, "Wayne"—whom they knew by then to be Taylor—was an officer and could "get" or "set [] up" the woman.

Together, the foregoing allegations against Taylor sufficiently resemble his actions toward H.H., in forcing her into prostitution by using his coercive power as a police officer, to make her injury foreseeable. Sergeant Aftel even testified that Taylor's crimes "didn't surprise" him "[b]ecause of the nature of the original allegations." In addition to these allegations, Taylor's supervisors were or should have been aware that narcotics officers, especially those with undercover training and experience, face a heightened risk of corruption. In sum, a reasonable jury could conclude that H.H.'s injury was foreseeable in light of the allegations against Taylor and the City's failure to take adequate measures to prevent further incidents.

A reasonable jury could further conclude that the City's failure to supervise and discipline Taylor was a substantial factor leading to the injury to H.H. Taylor himself stated in an affidavit that he felt "empowered to believe I could get away with unlawful activities," because "little or

21

nothing came of [the] investigations" into the allegations against him. A reasonable jury could find that, had Taylor been adequately investigated and disciplined, he would not have felt empowered to force H.H. into prostitution. *See Vann*, 72 F.3d at 1051 (holding that a reasonable jury could find that the NYPD's retention of an officer "despite his abusive history empowered him to make arrests even while off duty" and that the Department's indifference to complaints "caused [the officer] to feel entitled, whether on duty or off, to compel the 'respect' he demanded through the use of violence"); *see also Pipitone v. City of New York*, 57 F. Supp. 3d 173, 196 (E.D.N.Y. 2014) ("It is plainly foreseeable that the failure to discipline an officer who has been caught red-handed might embolden that officer's close associates and colleagues to engage in similar misconduct.").

The City argues that, since Taylor was on modified duty, and thus already facing discipline, at the time he prostituted H.H., plaintiff cannot show that further discipline would have prevented Taylor's crimes. However, given his disciplinary history, Taylor could have believed that the only kinds of violations with which his supervisors were concerned were violations involving the Department or its property, such as his losing a Department transmitter and his misuse of a Department vehicle. And even though Taylor was initially placed on modified duty because Captain Monahan believed it was possible that Taylor stalked and harassed Moore, his supervisors later determined that the allegations were unsubstantiated based upon an inadequate investigation, which could have led Taylor to believe that such allegations would not be investigated thoroughly. A reasonable jury could conclude that better investigating the allegations against Taylor would have communicated to him that his conduct would be scrutinized and that he would be disciplined and even prosecuted if appropriate, and, finally, that he would have been deterred.

The City further argues that Taylor's intentional and criminal conduct is an intervening factor that severs proximate causation. However, a municipal defendant in a § 1983 action is

"liable for those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties." *See Warner v. Orange Cty. Dep't of Prob.*, 115 F.3d 1068, 1071 (2d Cir. 1996) (internal quotation marks omitted); *see also Cash*, 654 F.3d at 334 (holding that the county could be held liable under § 1983 where a prison guard raped a prisoner). Since they were reasonably foreseeable, Taylor's actions do not sever proximate causation. In sum, a reasonable jury could conclude that the City proximately caused H.H.'s constitutional deprivations.

### III.     Plaintiff's State Law Negligent Supervision and Retention Claim

To prove a claim for negligent supervision and retention, the plaintiff must establish that "the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence." *Doe v. Guthrie Clinic, Ltd.*, 519 F. App'x 719, 721 (2d Cir. 2013) (quoting *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004)). Propensity is equivalent to reasonable foreseeability. *See id.* (using "propensity" and "reasonably foreseeable" interchangeably); *Gonzalez v. City of New York*, 133 A.D.3d 65, 70–1 (1st Dep't 2015) (same); *C.D. of NYC Inc. v. U.S. Postal Serv.*, 2004 WL 2072032, at *5 (S.D.N.Y. Sept. 16, 2004) (same).

The principles of proximate causation under § 1983 are "derived from tort law." *See Cash*, 654 F.3d at 342. Therefore, my finding above that Taylor's actions could be found reasonably foreseeable apply equally to plaintiff's negligence claim.

The City asserts, however, that the New York State doctrine of governmental immunity bars plaintiff's negligent supervision and retention claim. The City argues that the decision not to transfer the investigation of Taylor from OCCB to IAB, even if negligent, was a discretionary act entitled to governmental immunity, and, therefore, any claim of negligence that rests on that

decision is barred. However, based on the record before the court, the City's decision is not entitled to governmental immunity.

Under New York law, "a governmental entity enjoys immunity from suit for official actions 'involving the exercise of discretion or expert judgment in policy matters,' even if its exercise of such discretion was 'negligent' or constituted a 'misjudgment' or a 'mistake,' so long as the governmental entity actually exercised such discretion by considering all relevant information in making its judgment and by complying with its own established regulations and procedures." *Public Administrator, Bronx County v. City of New York*, 271 A.D.2d 220, 220–21 (1st Dep't 2000) (internal citations and alterations omitted) (quoting *Mon v. City of New York*, 78 N.Y.2d 309, 313–315 (1991)). On the other hand, where "'there is no evidence that... the City in fact made any such decision or exercised any such discretion..., and no indication that it made a judgment of any sort,'" the governmental entity does not enjoy immunity. *Haddock v. City of New York*, 75 N.Y.2d 478, 485 (1990). In *Haddock*, the plaintiff sued the City for negligent retention of an employee with a criminal record after he raped her. 75 N.Y.2d 478. The New York Court of Appeals held that the City was not entitled to governmental immunity because there was no evidence that Parks Department officials actually exercised judgment in retaining the employee in spite of his criminal record. *Id.*

Here, there is no evidence that the City exercised any discretion or made any judgment in deciding not to transfer the investigation to IAB. The evidence in the record merely shows that Sergeant Aftel asked his commanding officer, Captain Gallagher, to transfer the investigation, and that his request was denied. Captain Gallagher stated in an affidavit that he has no recollection of the investigation into Taylor or his decision denying Sergeant Aftel's request. Nor has the City presented any evidence that such a judgment was made at the time the investigation was first

assigned to OCCB. *See Cerbelli v. City of New York*, 2008 WL 4449634, at \*22 (E.D.N.Y. Oct. 1, 2008) (governmental immunity is an affirmative defense); *see also Black v. Coughlin*, 76 F.3d 72, 75 (2d Cir. 1996) (defendant bears the burden of establishing affirmative defense on a motion for summary judgment).

More importantly, however, plaintiff's negligence claim rests on the inadequacy of the investigation into Taylor, not on the decision that OCCB investigate the allegations. The failure to transfer the investigation to IAB merely illustrates that Department officials allocated limited resources to the investigation since OCCB did not have the resources available to IAB. However, had OCCB itself investigated Taylor adequately, plaintiff would have no claim for negligence simply because OCCB rather than IAB conducted that investigation. Accordingly, the doctrine of governmental immunity does not bar the City's liability here.

## CONCLUSION

For the reasons discussed above, defendant's motion for summary judgment is **DENIED.**

**SO ORDERED.**

/s/ *Nina Gershon*
**NINA GERSHON**
**United States District Judge**

Dated: August 4, 2017
    Brooklyn, New York